**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK APPLE IPHONE IN A CLEAR CASE CURRENTLY LOCATED AT THE ANDROSCOGGIN COUNTY SHERIFF'S OFFICE | No. 2:26-mj-74-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Kurt Ormberg, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been in this position since March 2005. I have been assigned to the Boston Field Office, Portland Resident Agency since April of 2021 and I am currently assigned to the FBI Maine Safe Streets Task Force ("SSGTF"). Prior to my employment as an FBI Special Agent, I was a Police Officer then Detective/Special Agent with the U.S. Capitol Police in Washington D.C. In my career, I have investigated numerous crimes, including drug crimes.

2.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search a black iPhone with a clear case seized from the person of RAYMUNDO DEJESUS (the "Target Device").

3.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, other agents, and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

4.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 (Conspiracy

to Distribute Controlled Substances) and 21 U.S.C. § 841 (Possession with intent to distribute controlled substances) have been committed in the District of Maine. There is also probable cause to search the Target Device described in Attachment A for evidence and instrumentalities of the crime as described in Attachment B.

5. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court a District Court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. I hereby adopt and incorporate by reference the affidavit filed in support of a Complaint in the United States District Court, District of Maine Case No. 2:26-mj-00002-KFW, attached hereto as Exhibit 1.

7. As detailed in Exhibit 1, on September 15, 2025, two Hispanic males fled from law enforcement at an address on Fuller Hill Road in Woodstock, Maine. After a foot pursuit, law enforcement apprehended one of the males, who was identified as JONATHAN TORRES. At the time of TORRES's arrest, law enforcement recovered a bag containing approximately 30 grams of cocaine HCL from his person. The second male, later identified as RAYMUNDO DEJESUS, was not located at the time.

8. During a track of the surrounding area, law enforcement recovered additional drugs in the brush, near the location where TORRES was apprehended. When TORRES was apprehended, DEJESUS was approximately an arm's length away from TORRES, but DEJESUS was able to continue running into the wood line and evade law enforcement. The drugs recovered were approximately 40 grams of a substance containing fentanyl and approximately 19 grams of cocaine base. All of the recovered

substances field-tested presumptively positive. They were subsequently sent to the lab and confirmed to be controlled substances.

9.      Law enforcement identified the second individual as DEJESUS after searching a rental car that was parked on the property pursuant to a state search warrant. Inside the vehicle, law enforcement located mail addressed to RAYMUNDO DEJESUS and a rental agreement indicating that the renter of the Hyundai was RAYMUNDO DEJESUS. Law enforcement subsequently reviewed a driver's license photo of RAYMUNDO DEJESUS and observed that he appeared to be the individual who fled from law enforcement on September 15.

10.      Subsequently, on October 15, 2025, law enforcement obtained information about a firearm that TORRES possessed and hid during the foot pursuit from a cooperating witness ("CW-2"). According to CW-2, TORRES said he had hidden a Glock 17 firearm while fleeing from law enforcement on September 15, 2025, and described the firearm as being located somewhere to the east of the main residence and the powerline where TORRES was taken into custody.

11.      Law enforcement obtained a state search warrant for the residence on Fuller Hill Road, which they executed on October 29, 2025. During the search, law enforcement recovered a loaded black Glock 45 9mm pistol bearing serial number CETC592, which was recovered a few feet from where the bags of fentanyl and cocaine were located during the track.[1] Law enforcement also recovered a loaded pink SCCY model CPX2 9mm pistol bearing serial number 627290, which was tucked into a stone

---

[1] Prior warrants have referred to this firearm as a Glock 17. These firearms are very similar. Law enforcement has confirmed that the firearm recovered is a Glock 45.

wall a few feet from where TORRES was taken into custody and not far from where DEJESUS was standing when TORRES was apprehended.

12.     As further detailed in Exhibit 1, a separate cooperating witness ("CW-1") identified the two Hispanic males at their residence on September 15, 2025 as "Oni" and "Pablo." When shown a photograph of DEJESUS, CW-1 identified him as Pablo.

13.     Law enforcement obtained a search warrant to review a cell phone seized from CW-1's person on September 15 (2:25-mj-315-KFW). FBI identified several text messages on CW-1's phone in which CW-1 communicated with phone number (978)-641-8751 in the days leading up to the incident described above. This phone number was saved in CW-1's cell phone as "Paaablooó".

14.     In addition to the messages summarized in Exhibit 1, CW-1 and "Paaablooó" exchanged the following messages on September 12, 2025:[2]

| Time | Sender | Message | Translation |
|---|---|---|---|
| 7:37 PM | Paaablooó | Y lo play tan bueno paya contigo | And the play is so good, paya, with you |
| 10:23 PM | CW-1 | ¡Crea una manada y trabajaremos juntos! Ya sabes cómo lo hago. | Create a pack and we'll work together! You know how I do it. |

I believe this conversation is drug related. I know from my training and experience that drug dealers often refer to a drug transaction as a "play", a package of drugs as a "pack", and selling drugs as "work".

---

[2] The text messages exchanged between the individuals are largely in Spanish, including the messages quoted herein. I have included a translation of these messages, which I obtained from Google Translate.

15. Through law enforcement queries, FBI determined that the (978)-641-8751 phone number was associated with DEJESUS. RAYMOND DEJESUS is identified as the most recent subscriber of this phone number.

16. On February 4, 2026, a federal Grand Jury sitting in the District of Maine returned an indictment charging DEJESUS with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841.

17. DEJESUS was arrested on the federal arrest warrant in Massachusetts on February 5, 2026. The TARGET DEVIEC was on DEJESUS's person at the time of his arrest. The TARGET DEVICE was seized by the Massachusetts State Police and turned over to FBI Maine SSGTF. It was electronically preserved and entered as evidence, pending application of a federal search warrant.

18. Prior to DEJESUS's arrest, this Court had issued a ping warrant for the cell phone assigned telephone number (978)-641-8751 (2:26-mj-0008-KFW). Law enforcement monitored the location and pen register data leading up DEJESUS's arrest. The last ping reviewed by law enforcement before DEJESUS's arrest showed the TARGET DEVICE less than 50 meters from the location where law enforcement ultimately located and arrested DEJESUS. Accordingly, I believe the TARGET DEVICE is associated with telephone number (978)-641-8751 (the same telephone number that communicated with CW-1 leading up to the incident on September 15).

19. Based on the information provide herein, I respectfully submit that there is probable cause to believe that a violations of Title 21, United States Code, Sections 846 (conspiracy to commit drug trafficking) and 841 (possession with intent to distribute controlled substances) have been committed in the District of Maine, and that

5

there is probable cause to search the Target Device described and shown herein and in Attachment A for evidence and instrumentalities of the crime as described in Attachment B.

## TECHNICAL TERMS

20.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.

Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross

8

state and international borders, even when the devices communicating with each other are in the same state.

21.     Based on my training, experience, and research, I believe that the Target Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, websites and other content that have been viewed via the Internet are typically stored for some period of time on the accessing device. This information can sometimes be recovered with forensics tools.

23.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

g.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

h.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

i.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

j.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

k.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

25.     *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described and shown in Attachment A to seek items described in Attachment B.

Respectfully submitted,

Kurt Ormberg
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:  Feb 26 2026

City and state:  Portland, Maine

_____
*Judge's signature*

Karen Frink Wolf,   U.S. Magistrate Judge
*Printed name and title*

11